## In the Matter of FLORENCE, ABRAHAM, SHIRLEY and THOMAS VARDINAKIS, Infants.

Domestic Relations Court of City of New York, Children's Court Division, New York County, July 2, 1936.

*Alfred B. Kronovet,* for the father.

No appearance for the mother.

Tulin, J. The four children before the court come here on the petition of two child-caring institutions, one Catholic and one Protestant, to which they were sent as neglected children by this court on the petition of their mother. Both institutions seek to be relieved of these children because of the problems created by the conflict over their religious education between the mother who is an adherent of the Roman Catholic faith and the father who is a Mohammedan.

These children have been subjected to the neglect inherent in the limitations of the mother and the father and in the broken home from which they come. This neglect has been seriously aggravated by an old and continuing religious feud between the parents. Although there is no reason to doubt that this feud originated in the sincere religious differences between the parents, it has long since become primarily a weapon used by each parent to strike at the other through the children who have suffered most from this continued conflict.

This situation is reminiscent of the history of English cases dealing with the determination of the religious education of children which started in the late sixteenth century. One repressive measure after another was enacted to rid England of the " papist " control of education and these laws were extended by court decisions reflecting the prejudices of the day with little thought to the welfare of the children concerned. An interesting survey of the cases by L. M. Friedman (29 Harvard Law Review, 485, 1916) tells of the court depriving one widowed mother of her child on her remarriage to a Catholic, although she was bringing up the child as a Protestant in accordance with the religion of his father, and of the court depriving another widowed Catholic mother of her child for seven years on the ground that he might otherwise be weaned away from the church of his father. As the political aspects of this religious conflict diminished, we find the growth of a more enlightened point of view which ceased to identify all truth with any one kind of sect with the result that the courts began to turn their attention more to the interests of the children.

Happily for us the American tradition of religious freedom and freedom of conscience demands that all religious groups shall be treated with respect and as equal in standing before the law. Because of this tradition the use of the courts to support one religious group at the expense of another has been attempted but rarely. It has been said, however, that " there is perhaps no situation which has betrayed the judiciary to yield to its own religious prejudices so subtly as the issue of paternal abandonment in the face of rival religious claims between parents or relatives over some

poor child who had been made the object of religious zeal." (29 Harv. Law Rev. *supra*, at p. 492.) It is against this danger within ourselves, frequently not consciously recognized, that we must most carefully guard. Prejudice that precludes either a fair and earnest consideration of the rights of parents or where the best interest of the child may lie cannot be tolerated.

Although in England only the wishes of the father both during his life and even after death were considered in deciding in what faith a child was to be educated, the State of New York has long recognized that both parents have equal rights as guardians. (Dom. Rel. Law, § 81.) This court is, therefore, happily relieved of having children made the subject of a religious controversy in any cases except rare ones such as the one-now before the court, where in the process of saving the children from parental neglect, the court must also decide rival claims as to religious education between separated and hostile parents. There are no interests entitled to consideration except those of the parents and the children.

In the case now before the court, the mother, a member of the Catholic faith, was married to the father, a member of the Mohammedan faith, by a Protestant minister in 1920. There is no evidence of any antenuptial agreement as to the religious education of the children. After the birth of the oldest boy, the mother had him baptized in the Catholic church without the knowledge of the father and against his expressed wishes, during a period of the father's desertion from the home. Subsequently, after the birth of the next two children, the father had them inducted into the Mohammedan faith in the presence of the mother but also against her wishes. Although the father now alleges that the fourth and youngest child was also inducted into the Mohammedan faith, this claim was not made when the case was first before the court and I, therefore, find the weight of the evidence shows that the child has never been formally admitted to any church.

A custom has grown up that where a child is once baptized or entered in any prescribed manner into a church, that the child is to be treated as belonging to that church so long as he is a minor. There is no foundation in law for such a position. The English cases have held that it is for the father to determine the religious education of a child during his minority. American law generally (Cf. *Hernandez* v. *Thomas*, 50 Fla. 522; 39 So. 641) recognizes both parents as joint guardians of their children. Where they agree as to the religious education of their children, no question arises, even if such agreement includes a change of adherence from one religion to another during the child's minority. (See *Matter of Lamb*, 139 N. Y. Supp. 685.) The rights of parents in regard to

their minor children has long been recognized, but there is no right in any church to compel continued adherence. Where the parents disagree as to the religious education of their children, the court must consider not only whether there was an admission of the child to any church but the entire situation. It is important to discover whether there was an antenuptial agreement, whether the child's admission to the church was with the knowledge and consent of both parents, the extent to which the child has received any form of religious education, whether the child has reached years of discretion and if so what preference the child feels (See *Matter of McConnon*, 60 Misc. 22), and finally in which religious environment the particular child before the court is most likely to develop fully and happily. In *People ex rel. Wollston* v. *Wollston* (135 Misc. 320) the court stated: "It is true the courts will, in determining what is for the best interests of the child, take into consideration among other things the religious bringing up and teaching of such child, and when practicable and feasible will leave or place the child with persons of the same religious faith. But it is also true that such considerations are not controlling especially where it is clear that temporal advantages will result, as in the instant case, by placing the child with others." (*Matter of Thoemmes*, 238 App. Div. 541. See, also, *Matter of Crickard*, 52 Misc. 63; *Matter of Jacquet*, 40 id. 575.)

The children in this case were first brought before the court when the home was finally broken up through the serious illness of the mother. At that time the mother brought the children to the court alleging that the father was unfit to care for the children in her absence. The court made a finding that the children were neglected and in need of the care and supervision by the State, and temporarily placed them in a Catholic institution so that they might remain together. The court, however, directed that no religious instruction should be given to the three younger children who were not Catholics. When this placement by the court met with the violent opposition of the father, the court agreed to transfer the four children to a Protestant institution as the most neutral place available. After a short period of acquiescence in this plan on the part of both parents, the religious question was again raised, and the oldest boy was returned to the Catholic institution to which he had first been sent, while the three younger children were placed in a second Protestant institution since there was no Mohammedan institution to which they could be sent. The oldest boy was returned to the court by the Catholic institution after he had run away three times because of his insistence that he wanted to be a Mohammedan like his father. The three younger children were

returned to the Protestant institution although their adjustment had not been good because of the father's continued opposition to the religious instruction they were receiving which culminated in his threat to blow up the church to which his children were being sent.

The extent of the injury to the children which must inevitably follow from such a situation can hardly be estimated and outweighs in importance the legal rights of either parent in regard to the determination of the future placement of these children. In *Purinton* v. *Jamrock* (195 Mass. 187, 199; 80 N. E. 802, 805), where there was a conflict in regard to the religious education of the child between the mother and adopted parents, the court said: " The wishes of the parent as to the religious education and surroundings of the child are entitled to weight; if there is nothing to put in balance against them, ordinarily they will be decisive. If, however, those wishes cannot be carried into effect without sacrificing what the court sees to be for the welfare of the child, they must so far be disregarded."

In an effort to determine what is most likely to make for the welfare of these children, the court examined the children in the absence of both parents. The oldest boy, who is now fifteen years of age, is clearly determined to follow his father in the Mohammedan faith. The oldest girl, who is now almost thirteen, is equally sure that she wishes to attend the Catholic church with her mother. The two younger children, who are nine and five respectively, are too young to be seriously concerned with this problem.

Some courts have held that when a child reaches " years of discretion " the leanings of the child should be considered. Other courts have been reluctant to consider the preference of children on the ground that they are unable to evaluate the comparative merits or meaning of religious faiths. It is clear that there can be no arbitrary rule by which any court can determine when a child reaches " years of discretion." It is also clear that the capacity for an intellectually correct evaluation of differing religions is not the touchstone to religious faith in either children or adults. The court cannot consider too seriously what may reasonably be considered either as an impulsive reaction of a child or the indoctrinated words of a child repeated without conviction at the instance of some zealous adult. Where, however, children are forced into the midst of a religious conflict between their parents, that conflict becomes identified with the conflict between the parents. In choosing the religion of one parent rather than the other, the child is frequently either consciously or unconsciously also choosing one parent rather than the other and is indicating

to the court in the clearest way possible with which parent he has most sympathy and the greatest sense of security. The positive choice of a religion by an intelligent child of thirteen or fourteen must, therefore, be seriously considered in determining what is best for his own welfare.

In the case before the court there was no antenuptial agreement as to the religious education of the children. The admission of the children to both churches was without the common consent of both parents in both instances. The children have received no consistent religious education of any kind. The children have been subjected to the conflict between their parents in which the differences of religion have aggravated a generally unhappy home.

The father's brother, who is a Mohammedan, has opened his home to the oldest boy and the oldest boy has indicated that he is eager to go into that home. It is the father's earnest desire that he should, and the mother has agreed to this placement. The boy, Thomas, is, therefore, paroled to the home of his paternal uncle under the supervision of the court with the understanding that his placement will be watched carefully by the probation officer and that arrangements will be made for weekly visitations to the mother.

The three younger children cannot be placed in any home of relatives. They are sorely in need of a normal home environment rather than institutional care at this time. The three younger children have always been together and it seems to their best interest to keep them together so long as that is possible. In order to do so with the greatest likelihood of a wholesome adjustment they must, however, be placed in a home that can be considered a neutral meeting ground for both parents. The three younger children are, therefore, to be placed in a Protestant foster home under the supervision of the court with the understanding that there will be no religious instruction given to them by the foster parents.

The oldest girl, who is thirteen, has indicated clearly her preference for her mother and her mother's religion. In view of all the facts in this case, that preference and that feeling must be respected. The mother is to be permitted to take the oldest daughter with her to the Catholic church. The father is to be permitted to take the two younger children with him to the Mohammedan church. If at any time the probation officer in charge of this case finds that the religious conflict between the parents is carried into the foster home, the case is to be brought back so that if the court finds that either parent is unreasonable in the handling of the children, the visitations may be restricted.