THE PEOPLE OF THE STATE OF NEW YORK ex rel. HAMPORTZOON CHOOLOKIAN, Relator, against MISSION OF THE IMMACULATE VIRGIN et al., Defendants.

THE PEOPLE OF THE STATE OF NEW YORK ex rel. HAMPORTZOON CHOOLOKIAN, Relator, against NEW YORK FOUNDLING HOSPITAL et al., Defendants.

Supreme Court, Special Term, New York County, December 30, 1947.

*Samuel M. Blinken* for relator.

*Charles G. Coster* for Mission of the Immaculate Virgin, defendant.

*John P. McGrath, Corporation Counsel,* for Benjamin Fielding, as Commissioner of the Department of Welfare of the City of New York, defendant.

*Joseph V. McKee* for New York Foundling Hospital, defendant.

*Dr. Robert W. Searle,* Secretary of Human Relations Commission of the Protestant Council of the City of New York, *amicus curiæ.*

*Richard K. Gregory* for Armenian Apostolic Orthodox Church in North America, *amicus curiæ.*

*Raymond L. Wise* for American Civil Liberties Union, *amicus curiæ.*

LUMBARD, J.   The relator Hamportzoon Choolokian by writ of habeas corpus directed to the Mission of the Immaculate Virgin in whose keeping are two of his sons, George 12, and Albert, 11, and the New York Foundling Hospital in whose keeping is his daughter, Alice, 6, and by amendment, directed also to the commissioner of welfare of the city of New York as the head of the agency to whose care the relator had voluntarily committed these children, asserts his right to have these children returned to him for the purpose of taking them to Soviet Armenia.   At the time of securing the writ the father had planned to sail the next morning for Soviet Armenia with his wife and two other children to be repatriated under a plan undertaken at the expense of the Soviet Government.

In their returns to the writs the Mission and the Hospital assert that the children were committed to their care in 1942, by the department of welfare of New York City, pursuant to law, that they are natural born citizens of this country; that the father is unable to properly maintain, care for and educate the children.   The Mission and the hospital ask that the children be remanded to their care.

The commissioner of welfare of the city of New York who has been represented throughout these proceedings has taken no position regarding this writ, and has held in abeyance his order for their release to join their father, stating that in view of the position taken by the Mission and the hospital he would leave the matter for decision by the court.   Consequently, the commissioner has not given the consent required by section 383 of the Social Welfare Law.

The father committed these three children to the custody of the department of welfare by executing a writing to that effect,

on January 30, 1942, as to Alice, and on March 8, 1942, as to George and Albert and three older children. Therefore in considering these writs this court is governed by the provisions of section 383 of the Social Welfare Law which reads in part: " 1. The parent of a child remanded or committed to an authorized agency shall not be entitled to the custody thereof, except upon consent of the court, public board, commission, or official responsible for the commitment of such child, or in pursuance of an order of a court or judicial officer of competent jurisdiction, determining that the interest of such child will be promoted thereby and that such parent is fit, competent and able to duly maintain, support and educate such child * * *."

The question presented is whether the court can here make the determination that the interest of these children will be promoted by giving the father custody for the purpose of taking the children to Soviet Armenia and that the father is fit, competent and able duly to maintain, support and educate the children in Soviet Armenia.

Judge Personius in *Matter of Presler* (171 Misc. 559, 562) has stated the principal considerations which must guide the court in these cases: " From birth the infant is a ward of the State. It stands in the relation of *parens patriæ*. In this and similar proceedings the fundamental consideration is the welfare of the infant. (*People ex rel. Converse* v. *Derrick*, 146 Misc. 73, 77, 78.) The infant's welfare is paramount to the natural right of a parent. (*Matter of Bock* [*Breitung*], 280 N. Y. 349, 353.)" (See, also, *Finlay* v. *Finlay*, 240 N. Y. 429; *People ex rel. Mahoff* v. *Matsoui*, 139 Misc. 21; *People ex rel. Lewisohn* v. *Spear*, 174 Misc. 178; *People ex rel. Gibson* v. *Starbuck*, 42 N. Y. S. 2d 820.)

These three children as well as the other children of the relator were born in the United States and have spent all their lives here. As American citizens, these children if taken to a foreign land by their father would not lose their citizenship, despite the father's repatriation as a citizen of Soviet Armenia, unless and until they become twenty-three years old without having acquired permanent residence in the United States. In other words, if the children return to the United States to take up permanent residence here before they become twenty-three, they would not lose their American citizenship by virtue of the intended repatriation of the parents (U. S. Code, tit. 8, § 807; *Perkins* v. *Elg*, 307 U. S. 325).

From an exchange of notes between the State Department of our Government and the Soviet Government in April and May, 1947, it appears that '' notwithstanding all their personal efforts and the repeated representations of the American Embassy in Moscow '' the Soviet Government for some time has refused to permit American citizens' to leave Soviet territory for the United States and has even refused to permit representatives of our Government to interview such citizens. It has also refused to permit American citizens to bring their wives back to this country. Probably at no other time in our history as a nation have we been confronted with a situation where our citizens have been treated virtually as prisoners by a foreign power with whom we are at peace. Recent reliable reports from France indicate that their citizens are similarly treated by the Soviet. (*New York Herald Tribune,* Dec. 23, 1947, p. 1.)

The promise of American life has brought to our shores millions of men and women from all lands and of every tongue. The peopling of our land is the greatest migration in all history. From 1901 to 1930, over eighteen million people came here to make their homes. The tide was so great that we adopted numerous laws limiting the number of those who could enter. Those who came did so at great sacrifice in order to live out their lives in freedom; to whom their greatest goal was citizenship in the United States. For them nothing had greater value and was more to be cherished. So it is with us. They came here, as did this father, so that their children might be born on American soil and so acquire citizenship through the good fortune of their birth in our country.

In keeping with our tradition that every citizen has a right to the full enjoyment of life, liberty and the pursuit of happiness, our laws carefully protect those rights of citizenship and our courts have been the guardians of those liberties. The Supreme Court of the United States, in *Schneiderman* v. *United States* (320 U. S. 118, 122) has recently said of American citizenship: '' For it is safe to assert that nowhere in the world today is the right of citizenship of greater worth to an individual than it is in this country. It would be difficult to exaggerate its value and importance. By many it is regarded as the highest hope of civilized men. This does not mean that once granted to an alien, citizenship cannot be revoked or cancelled on legal grounds under appropriate proof. But such a right once conferred should not be taken away without the clearest sort of justification and proof.''

Certainly when citizenship is conferred by birth on our soil it is to be guarded no less jealously.

Of course American citizens are free to expatriate themselves, and our law recognizes that right of expatriation as a " natural and inherent right of all people, indispensable to the enjoyment of rights of life, liberty and the pursuit of happiness; * * *." (U. S. Code, tit. 8, § 800.)

And conversely our laws have given to infant American citizens the right of preserving their citizenship by returning to this country within two years after their twenty-first birthday at which time we consider them to be capable of making their own choice and acting thereon in matters of such importance.

If the father were permitted in this case to take these three infant children to Soviet Armenia, it seems clear under present conditions that their right to avail themselves of the privileges of their American citizenship might be forever lost. It is unthinkable that an American court could permit this father to place his infant children in such an irretrievable position. While he may make that choice for himself, it will certainly not promote the best interests of the children, as this court is required to find by section 383 of the Social Welfare Law, to permit the father or anyone to dissipate beyond redemption these priceless rights of the children. The exercise of these rights should not be left to the remote chance that they might some day before their twenty-third birthday be able to escape from Armenia and return to the United States. (Cf. *Dos Reis ex rel. Camara* v. *Nicolls,* 161 F. 2d 860.)

These reasons compel a finding that it would not be to the best interests of the children to be taken to Soviet Armenia, even though it results in the temporary or even the permanent separation of these children from their parents.

It is appropriate to observe that a reading of the Soviet note of April 21, 1947, and the reply of our State Department of May 28, 1947, makes it seem probable that our State Department in consenting to assist the repatriation of Armenians did not realize that this would involve the taking to Soviet Armenia of natural born American citizens who in no sense could be considered as objects of repatriation. Nothing in the American note of May 28th can be construed to consent to the taking of such natural born American citizens as the three children here involved, since the note of the United States speaks only of the departure of " persons of Armenian origin ", although it is recognized that they might be American citizens, presumably by naturalization.

However, further examination of the history and circumstances of the Choolokian family compels the conclusion that even apart from considerations regarding citizenship, it is not to the best interests of the children to be cared for by their father in Soviet Armenia, and that he is not fit, competent and able to care for them. No showing has been made here as required by the State Social Welfare Law that the children would or could be properly cared for by the father in Soviet Armenia, or, for that matter, in any other country or even in New York City.

The father came to America in 1913, at the age of fourteen. He was naturalized in 1929, and has been continuously in this country except for a trip to Armenia in 1926. He speaks a pidgin English, mixing his words and ideas unintelligibly. He can neither read nor write any language.

For a few weeks in 1937, four of the children were committed to institutions as the mother was ill and the father was ill and out of work. In February, 1942, the mother was committed to a State asylum for the insane and ever since has been diagnosed as suffering from dementia praecox, with no sign of improvement. On home relief, without any regular employment, and unable to care for their six children, the father executed voluntary requests in January and March of 1942, for the commitment of the children to appropriate institutions by the welfare department of New York City. In March and April, 1942, the five older children, including George and Albert, were sent to the Mission and Alice, then a baby of a few months, was placed with the hospital.

Of course the father's humble origin, his illiteracy, and economic difficulties are in themselves no test of his fitness. The homes of such parents have contributed and always will contribute their share of able leaders to our national life. The father's aggravated economic situation, complicated further by the mother's mental illness, is here relevant because it resulted in the voluntary commitment of his children to the care of the department of welfare under the provisions of the Social Welfare Law. Here the father was not able to maintain a home for the children.

The father attempted to earn a living shining shoes. For a while he was on relief. He later secured a position doing similar work with a shoe company, and commencing in September, 1944, he agreed to contribute to the children's support and from then until October, 1947, he paid a total of $882 being in arrears

$287.14 as of October 14, 1947. Meanwhile the father visited the mother and children from time to time. Certainly he has always wanted to do what he could for his family and has been as devoted and diligent as his limited means and intelligence permitted. It is apparent that he has a genuine affection for the children but the misfortunes and difficulties of life have been too much for him to cope with and, as the numerous reports of the welfare department indicate, he has been confused and bewildered by a multitude of problems beyond his ability to solve. A reading of the voluminous records of the department of welfare also shows that the father has almost always had considerable difficulty in controlling the children.

In 1946, when his earnings were $40 to $45 a week, the father asked to have the three oldest children returned to his care. In August and September of 1946 the welfare department caused the Mission to release Susan, Anthony and Anna, then sixteen, fourteen and twelve respectively, and they went to live with him in his three-room apartment at 306 East 32nd Street. In the spring of 1947, Susan left home and her present whereabouts is not known. The record also shows that the father had some difficulty with Anthony after his return.

When this matter first came on for hearing on the morning of November 1st the court felt that the matter could not be disposed of summarily before the ship left, and the father elected to sail with his wife, who had been released by the asylum for that purpose, and two of their children, Anna and Anthony. This was done after it was stipulated on the record that it would be without prejudice to the relator's position in these proceedings.

In view of this background it is clear that if the father were now applying for the release of these three children to his care in New York City he could make no satisfactory showing that the interests of the children would be promoted by such release and that he is fit, competent and able to duly maintain, support and educate these three children, in addition to the three already entrusted to him, as is required by the Social Welfare Law. This much was conceded by his counsel.

Counsel for the department of welfare also stated that in the opinion of the department they would not have been returned for the father's keeping if he were in New York because he is in no position to support them.

To satisfy section 383 of the Social Welfare Law, which requires consent of the department of welfare or an order of

the court for the release of these children to the parents, counsel for the father furnished the department of welfare with a letter signed by Leonid N. Fedotov, Secretary of the Consulate General of the Union of Soviet Socialist Republics in New York City, on the letterhead of the Consulate. This letter, directed to the Commissioner of Welfare, stated: "This is to assure you that the transportation expenses of Mr. Cholakian and his family have already been provided by the Government of Soviet Armenia and that the Consulate General of the Union of Soviet Socialist Republics in New York guarantees that Mr. Cholakian's said children will not only be adequately transported to Soviet Armenia, but, in addition, that an adequate plan has been made for the care of these children in Soviet Armenia after their arrival there by their own parents or their relatives. We further guarantee that in the event that their parents or relatives will not be able to provide adequate care for these children, that the Soviet Armenian Government, through the Ministry of Social Security and the Ministry of Education of Soviet Armenia, will provide such care as will best serve the interests of these children."

This letter dated October 31, 1947, was drafted by one of the counsel to the commissioner at the request of Fedotov and signed by Fedotov, as the department felt that a letter of October 30th, also signed by Fedotov, was insufficient in that it merely stated: "Consul General of the U. S. S. R. in New York guarantees that Mr. Cholakian's children will be well taken care of when they arrive to Soviet Armenia."

Fedotov testified that he had visited Soviet Armenia for two months in 1936. He could state only that the Government there takes the responsibility of caring for children if their parents cannot afford it.

It does not appear what the father would do in Soviet Armenia to earn a living and what kind of a living it would be. Fedotov testified that there is no unemployment in Armenia and labor is badly needed, but such testimony is not sufficient to support any inference or conclusion that the father would be better able to support these children or any of them than he has been here in New York.

The only other testimony bearing on possible care of the family in Armenia was the father's statement that in the city of Yerevan he has sisters and brothers and relatives from whom he has not heard for five years. There is nothing in the record to support the assertion in the letter of the Secretary of the

Soviet Consulate that an adequate plan has been made for the care of the children in Armenia by their parents or their relatives. The statements in the letter of October 31st are therefore not supported by any facts or by the kind of knowledge or information to which this court can give any weight.

Clearly this is not a sufficient showing to justify this court in finding as required by the Social Welfare Law that the father is '' fit, competent and able to duly maintain, support and educate '' these three children in Soviet Armenia. To do so this court would have to accept vague and general assurances of the Soviet Consul here in New York speaking without any apparent authority or without any knowledge of conditions in Soviet Armenia and to substitute such uncertainties for the certainty of their continued good care by the Mission and the hospital which have already given them such care for over five and a half years.

When there is added to these considerations that of endangering beyond all but the most remote possibility of repair the previous and transcendant right of American citizenship of these infants, which right certainly cannot be reasonably entrusted to the care of this father, there is little room to doubt that this court cannot determine that the interests of these children will be promoted by permitting them to go with the father to Soviet Armenia.

Other cases concerning the custody of children and the special position of parents in regard to that custody are not in point in this proceeding, since, the children having been voluntarily committed to the care of the department of welfare and the defendants, section 383 of the Social Welfare Law bars their return unless the consent of the department is given or this court determines that the interest of the children will be promoted and that the father is fit, competent and able to duly maintain, support and educate them. These requirements not being met, the father is not entitled to the custody of the children.

While there was considerable testimony regarding the religious affiliation of the children, it is not a consideration necessary to any determination here. Of course, the father may during the minority of the children determine for them the matter of their religious education and affiliation just as he has done in the past. (*Matter of Vardinakis,* 160 Misc. 13.)

Accordingly, the writs of habeas corpus are dismissed. George and Albert are remanded to the Mission; Alice is

remanded to the hospital. The dismissal, however, is without prejudice to the right of the relator or any properly authorized person to make further application upon a showing that the rights of the children as American citizens would be protected and respected, that the interests of the children would be promoted by taking them to Soviet Armenia and that the father is fit, competent and able to duly maintain, support and educate the children in Soviet Armenia.