THE PEOPLE OF THE STATE OF NEW YORK ex rel. SLAVOLJUB DJUROVIC, Relator, against ZIVKA DJUROVIC, Defendant.

Supreme Court, Special Term, New York County, February 4, 1954.

*Vincent J. Malone* for relator.

*O. John Rogge* for defendant.

CORCORAN, J.  The relator, Slavoljub Djurovic, obtained this writ of habeas corpus directed to his wife, Zivka Djurovic, to produce before this court their two sons who are four and six years of age.  He seeks custody of these two boys on the ground that his wife intends to take them with her to Yugoslavia.  He claims that if she is permitted to do this, he will never see .his children again, because he will be in great personal danger if he returns to that country.

The relator husband and the respondent wife are natives of Yugoslavia.  One of their sons was born in Yugoslavia in 1947, and he was brought to this country by his parents in February, 1950.  Shortly after their arrival, the second child was born in this country.

This couple originally came to the United States because of the husband's employment with Yugo Metals, a company operated under the direct supervision of the Yugoslav Government. He came here to work in the New York office on an American visa granted at the request of the Secretary of State for Foreign Affairs of Yugoslavia.  By the terms of that visa, it is good only for the duration of his status as an employee of Yugo Metals.  It has expired, or is about to expire, since his association with that company came to an end during the past month.

Except for some business visits to Yugoslavia by the husband, this family has resided continuously in New York since February, 1950.  The husband and wife have been estranged for the past seven or eight months, although they have continued to live in the same home with their children.

In the last few months rumors came to the husband that serious charges had been made against him in Yugoslavia. According to the rumors, he had been charged with unfaithfulness to his wife and family and also with being disloyal to his country, and with having rejected its political and economic philosophy.

The husband had previously told his wife and some of his friends that he wished to remain permanently in the United States.  He believes that Yugoslavia is not the place to raise his family.  When he learned of the rumored accusations against him, there was added to his desire to remain in the United States, a fear of returning to Yugoslavia.  He told his wife of his wish to remain here, and of his fear of returning to their native land.  She tried to dissuade him.  She told him he had nothing to worry about in Yugoslavia, and that she had received assurances that he would not be harmed.  She also informed him

that she would not remain in the United States, but would return to Yugoslavia and take their two sons with her.

Pending attempts to settle their dispute, the parties placed their two children in a boarding school. They agreed that the children would stay there for one month, and would not be taken out by either parent without the consent of the other.

Two days later, the wife left her home and was driven to the school by two representatives of the Yugoslav Consulate. They took the children out of the school and refused to tell the husband where they had taken them. The children were placed on board a Yugoslav ship and kept there to await the time of sailing. It was just a few hours before the ship sailed for Yugoslavia that the return was made on this writ.

The husband claims that his wife intends to take their children from him permanently. He intimates that his wife and children are being used by the Yugoslav Government to force his return to that country to face charges. He states that he wishes his children to remain in this country and to be educated and trained in the American way.

The wife claims her husband's real reason for desiring to remain in this country is to carry on a love affair with one Irene Mendelsohn.

The evidence does not support the wife's claim, and it refutes her assertion that she and Irene Mendelsohn were not friends. There is nothing in the record to justify a conclusion that there was any meretricious relationship between the husband and Irene Mendelsohn.

The wife also disputes the husband's claim that he is afraid to return to Yugoslavia. She minimizes the reasons he gives for these fears and denies his charge that she herself would remain in this country if she were not completely under the domination of Yugoslav government officials.

She vigorously denies that she or her children are being used as a means of bringing her husband back to Yugoslavia to face charges. Whether this is true or not, the fact remains that the conduct of the wife and of certain representatives of the Yugoslav Consul after the children were left at the boarding school did not help to allay her husband's fears.

The Yugoslav Vice-Consul went with the wife to Brewster, N. Y., to take the two children out of the boarding school. They went in a car owned by the Yugoslav Consul, and driven by his chauffeur. The wife kept the children in hiding, and refused to tell her husband where they were. The only way the husband could even communicate with his wife was through the office of

the Yugoslav Consul. In order to see his wife, he had to make an appointment through the Yugoslav Consul. Finally, when plans were made for the wife and children to sail for Yugoslavia on a Yugoslav ship, no notice was given to the husband. Instead, his children were spirited aboard the ship several days before its scheduled sailing. The plan obviously was to take these children away without giving their father the chance even to say good-bye. The speed and secrecy with which the wife and Yugoslav officials acted were dramatized by her testimony that for her voyage across the ocean she took only $20 in cash and the clothes that she was wearing.

Her conduct during the hearings was no less strange. She was represented by a lawyer supplied to her by the Yugoslav Consul. At the conclusion of the first hearing in my chambers, she and her husband agreed to return to their home with the children, pending a further hearing. Their attorneys also agreed to it. It was only after the Yugoslav Consul, who attended the hearing, protested against this arrangement that the wife revoked her consent. Her testimony at the hearings was not entirely credible.

Under all the circumstances of this case, I find that the husband is actually in fear of returning to Yugoslavia. I also find that this fear is not an unreasonable one. He has renounced his Yugoslav citizenship and any allegiance to communism, and he intends to seek asylum in this country. I am convinced that the husband desires to remain in this country and to bring up his sons as Americans.

Ordinarily, the court prefers that custody of such young children be awarded to the mother, with reasonable rights of visitation to the father. As was stated in *Ullman* v. *Ullman* (151 App. Div. 419, pp. 424–425): "The child at tender age is entitled to have such care, love and discipline as only a good and devoted mother can usually give. This should continue from intimate association until the infancy grows into something like boyhood, and while perhaps the exact limit cannot be stated, yet it will be when the infantile state has been passed. Meanwhile the father must not be excluded from a full opportunity to have such possession of his child as will enable him to impart to it what from the father enters into the child's character, and to indulge the affection that a father feels and bestows, whereby the boy may grow up in knowledge and love of him."

To award custody to this mother, however, would deprive the father of all rights of visitation. It may deny him his children forever, for he is afraid to go to Yugoslavia. If the wife succeeds in this proceeding, the two boys will lose the companionship and care of their father. It is easy to understand that the wife may desire to return to her native country where her parents and other relatives and friends live. It is difficult to understand, however, why she should wish to do this if it will place her husband in jeopardy or separate him from his children forever.

To grant custody to the husband will not have such a devastating effect upon the mother's rights. The father has offered to provide her with a home in the United States. He has even made offers to attempt a reconciliation of their marital differences. She can join with him in his request for asylum in this country. There is nothing in the record to indicate that she will not be permitted to stay in this country if she so desires, but she has consistently taken the position in this proceeding that she will not, under any circumstances, remain here.

There is still another consideration. The younger child was born in this country. Since his parents were not in the diplomatic service of the Yugoslav Government, this boy is a native-born citizen of the United States. The fact that Yugoslavia may also consider him a citizen of that country does not deprive him of his American citizenship (U. S. Code, tit. 8, § 1401; *Perkins* v. *Elg*, 307 U. S. 325).

It has been truly said that " nowhere in the world today is the right of citizenship of greater worth to an individual than it is in this country. It would be difficult to exaggerate its value and importance." (*Schneiderman* v. *United States*, 320 U. S. 118, 122.) The court will jealously guard this treasured birthright of the child. In *People ex rel. Choolokian* v. *Mission of Immaculate Virgin* (192 Misc. 454, affd. 274 App. Div. 1049, affd. 300 N. Y. 43, certiorari denied 339 U. S. 912), this court refused to permit a father to take his American born children with him to Soviet Armenia on the ground that to do so might result in their eventually losing the rights and privileges of American citizenship. In that case, the court refused to grant custody to the father, even though neither parent was able to care for the children in the United States. In this case, on the other hand, the boy's father is willing and anxious to have him brought up as an American boy. I believe he is sincere in this desire. In view of all these circumstances, I find that the mother is not acting for the best welfare of this boy in attempting to

take him to Yugoslavia. I find, moreover, that it would not be in the best interests of either boy to have them separated by their parents.

A mother has the duty and the right to nurture and bring up her children. That duty and right are inherent in the relationship of parent to child. They are so sacred that a court should intervene only for most compelling reasons. Such reason exists when, as in this case, father and mother fight each other to gain sole custody of their children. Then the court must step in. It does so, not in order to determine a contest between the father and mother, but for the purpose of protecting the rights of the children. For they also have rights. They are not the property of their parents nor spoils for a victorious litigant. When parents cease to act together for the welfare of their children and oppose each other's claim to participate in their rearing, the children become wards of the State until the court decides what is for their best interests.

It is my conclusion that the best interests of these children require that custody be given to the father. The order to be settled may provide for liberal rights of visitation for the mother. Settle order.