Jacob T. Zukerman, J.
This is a hearing to determine custody, on referral by the Supreme Court, Kings County, in a family situation already known to this court and on all other related matters.
THE PACTS
The parties were married in the Catholic Church in 1957, having .been born and raised as Catholics. There are three children: a boy aged 9, a girl aged 7, and a boy aged 4. All the children were baptized in the Catholic Church.
In 1964 the wife 'became a Jehovah’s Witness. This resulted in serious disagreements between the spouses. In September, 1965 the couple came before the Family Offenses Term of this court and a temporary order of protection was granted against the husband. In December, 1965, the order was made permanent for one year, directing the husband to abstain from any offensive conduct against the wife. On May 27, 1966 the husband was found in violation and sentence of 30 days was suspended during good behavior. He was directed to move from *971 the home but was allowed visitation on Sundays. The wife filed an additional petition for support for herself and the children. A finding was made on a means basis and the husband was ordered to pay $35 per week.
In the meantime the house in which the family lived was sold by the husband to his brother and in October, 1966, the wife and children were evicted from the home for nonpayment of rent. She and the children now live in a four-room apartment, rent of which is $98 per month.
The husband has been paying $35 per week regularly and the Department of Social Services is providing supplementary assistance. He is one week in arrears.
The husband brought a habeas corpus proceeding in Supreme Court, Kings County, which was referred to this court for determination.
THE ISSUES PRESENTED BY THE PARENTS
The husband maintains that by virtue of the fact that the wife has become a Jehovah’s Witness and that she is trying to bring the children up as such, their right to be brought up as Catholics is being affected and that if the children remain with the mother, they cannot be reared or taught as Catholics, and that it is in the best interest of the children to be raised in the father’s religious environment.
The wife maintains that ‘ ‘ the court lacks jurisdiction to interfere with the petitioner-mother’s right to direct the children’s religious education and training and that if an award of custody is made solely on religious grounds it would invade her constitutional rights contrary to the freedom of religion and separation of church and state clauses of the state and federal constitution ’ ’.
AS THE COURT SEES IT
The basic issue, in the view of this court, is whether the children are being so adversely affected 'by their continued education in a Catholic school while continuing to live with a mother, who is a Jehovah’s Witness, that they should be removed from the custody and care of their mother. The facts are clear that the mother is a good mother, providing a good and clean home and that the father is a devoted father, equally concerned about the welfare of the children. Were there no difference in the religion of the parents, the likelihood of a fairly stable, normal family relationship might have been good.
The difficulty seems to be compounded by the fact that the mother, aged 31, born in Italy and raised in the Catholic faith, who married her husband in the Catholic Church, has only *972 within the last three years become a practicing Jehovah’s Witness. The children had all been baptized in the Catholic Church and the older two children now attend a Catholic school, although the oldest child did attend a public school in the first grade and the second child attended kindergarten in a public school.
The mother admits that she would prefer to bring her children up as Jehovah’s Witnesses but did testify that she felt, as a Jehovah’s Witness, that the father did have the right to decide what kind of education the children should have. Thus she agrees that, if the father wishes the children to attend a Catholic school and to attend Catholic Church, she will allow them to do so. She states that she tries to help her children with their lessons in all but their religious subjects. Yet she feels she has the right to express to the children her feelings, as a Jehovah’s Witness, that the Catholic religion “ is not based on the Bible ”. She admits taking the children at times to Kingdom Hall, the headquarters and meeting room of Jehovah’s Witnesses, once in spite of the court’s oral admonition not to do so.
It is also true that when the court, in chambers, discussed the situation with the oldest child, aged 9, in the presence of counsel for both parties, he indicated he wishes to be brought up as a Catholic and that he was somewhat confused by the fact that his mother practiced another religion. I do not feel, however, that this is all-controlling in view of the age of the boy and in view of the boy’s statement that he and his father had discussed the expected interview with me. (He did say he had been told to tell the truth). “ The court cannot consider too seriously what may reasonably be considered either as an impulsive reaction of a child or the indoctrinated words of a child repeated without conviction at the instance of some zealous adult ”. (Matter of Vardinakis, 160 Misc. 13, 17 [1936, N. Y. City Dom. Rel. Ct.].)
There is no question that the mother had the right to change her religion and to practice her religion. Nor is there any question that Jehovah’s Witnesses have a moral and legal right to bear children and to raise them in the precepts of their religion. Those who are not Jehovah’s Witnesses will, of course, not agree with their beliefs and practices. They may be appalled, as is the father in this case, by their attitudes toward such matters as refusing to salute the flag, to hold public office, to serve in the armed forces or even to permit blood transfusion. But no one would suggest that where the spouses are both Jehovah’s Witnesses that they should be denied the right to bring up their children as Jehovah’s Wit *973 nesses, even if their beliefs are distasteful to us. Thus, a mother’s being a Jehovah’s Witness is no bar, in and of itself, to having custody of her children. And in this case, there is no evidence to suggest her unfitness as a mother.
The question does arise about the effect upon the children of the conflict presented by their continuing to attend Catholic school and being brought up as Catholics in spite of the mother’s difference in religion. The general rule is that the parent having custody will, absent special circumstances, be allowed to raise the children in his or her own religion. In this case the mother has agreed that the children may continue to attend Catholic school and may go to Catholic Church. There are many instances of intermarriage in which the children are brought up in a faith other than that of one of the parents, in which the relationship remains a good, healthy one. This is dependent largely upon the willingness and understanding of each parent to respect the right of the other parent to be what he or she wishes to be. It is helpful if the child is taught to respect the religious difference of the other parent and to recognize that, regardless of differences, there may be good in the heart and soul and deeds of those who believe differently than we do. This is particularly so where it is one’s mother or father whose faith is different, as is her or his right in our democratic way of life.
This does not imply that we do not recognize the inherent difficulties in a situation such as this. It will not be easy for the children to reconcile the teachings of the Catholic Church with the attitude of their mother. The mother should try to understand that this is so and should attempt to treat with respect the religious differences of the father and her children, especially since she agrees that the father has the right to determine the nature of their schooling.
Yet I feel that the choice must be in favor of allowing the children to remain with their mother. The alternative of having them live with their father’s brother and sister-in-law, the very same people who initiated the eviction action against the mother, is not a good one. Nor is there any other better plan available. “Only when moral, mental and physical conditions are so bad as seriously to affect the health or morals of children should the courts be called upon to act (People ex rel. Sisson v. Sisson, 271 N. Y. 285, 287-288 [1936].) This has not been in any way established.
Custody is awarded to the mother under the following conditions, violation of any one of which may be a basis for reconsideration of this determination:
*974 (1) The father may visit with children on Sundays from 8:30'! a.m. to 12 noon, for the purpose of taking them to Catholic; Church.
(2) The father may visit with the children, in or out of the; mother’s home, on Saturdays from 9:00 a.m. to 1:00 p.m.
(3) The father may take the children of school age to Catholic1 school every morning and he shall return them to the mother’s home directly after school.
(4) The mother shall not take the children to any headquarters or meeting hall of Jehovah’s Witnesses nor shall she instruct them in any teachings of Jehovah’s Witnesses.
Mutual order of protection for one year to incorporate above conditions.
Referred to Probation Department to discuss with the parents the possible referral for counselling around the above problems in relation to the attitudes of the parents and for any help which the children may need.
Arrears fixed at $35. Order continued at $35 per week plus $5 arrears effective October 24,1967.
Counsel fees awarded to the attorney for the petitioner in the sum of $350, to be paid directly as follows: $150 by November 15,1967; $100 by January 15,1968; balance by March 15,1968.